# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:08CR00024 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ANTHONY EUGENE DUTY AND** | ) | By: James P. Jones |
| **ROBIN MARIE DAVIS,** | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Michael A. Bragg, Bragg Law, PLC, Abingdon, Virginia, for Defendant Anthony Eugene Duty; and Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, for Defendant Robin Marie Davis.*

The defendants have filed motions for a new trial based on newly discovered evidence. For the following reasons, the motions will be denied.

I

The defendants Anthony Eugene Duty and Robin Marie Davis were convicted in a joint jury trial of knowingly conspiring to distribute and to possess with intent to distribute fifty grams or more of crack cocaine, in violation of 21 U.S.C.A. §§ 841(b)(1)(A), 846 (West 1999 & Supp. 2009). After I denied their original posttrial motions, *United States v. Duty*, No. 1:08CR00024, 2009 WL 88540 (W.D. Va. Jan.

13, 2009), Duty filed a Second Motion for New Trial and Davis filed a Motion for New Trial Under Rule 33, both based on newly discovered evidence. On June 18, 2009, I held an evidentiary hearing on these motions and allowed the parties to file supplemental briefs. This Opinion sets forth the evidence before the court and my rulings on the latest motions for a new trial filed by Duty and Davis.

Fifty-one defendants were charged in this case for offenses relating to the distribution of crack cocaine. Following the Indictment, the defendants were severed into four separate groups for trial. Most of the defendants eventually pleaded guilty, and as to those who went to trial, all but one were convicted by juries.

During the first three trials, codefendants Paul Vaughn, Derrick Evans, and Marcus Watkins testified for the government. Since then, Vaughn, Evans, and Watkins have recanted their trial testimony and have moved to withdraw their guilty pleas. In support of the present motions, both Duty and Davis rely on the recanting statements made by Vaughn, Evans, and Watkins. Duty also claims that the government failed to disclose impeaching evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

These issues have been briefed and are ripe for decision. I will address them in turn.

## II

Under all the circumstances, including my opportunity to preside at all of the trials and hearings in the case and my review of the extensive record, I do not believe that either Vaughn, Evans, or Watkins fabricated their prior trial testimony. Therefore, on this ground, the motions for a new trial will be denied.

### A

Early in this case, Vaughn, Evans, and Watkins agreed to cooperate with the government. Vaughn testified before the Grand Jury. They each signed plea agreements and testified consistently throughout the first three jury trials. In advance of the fourth trial, however, Vaughn, Evans, and Watkins sent letters to the court recanting their prior testimony. At the evidentiary hearing, Vaughn, Evans, and Watkins testified and affirmed statements made in their letters.

#### 1

Vaughn, Evans, and Watkins provided detailed testimony for the government. Vaughn testified at the Grand Jury proceeding and at the first and second trials. Evans testified at the first three trials, while Watkins testified only at the first trial.[1]

---

[1] The first trial, which began on October 6, 2008, involved Duty, Davis, and Evans' wife, Christine Evans. The second trial, which began on October 27, 2008, involved defendants Douglas Lee Stallworth and Bruce Edward Baumgardner. The third trial, which began on December 15, 2008, involved Travis Dell Jones and Brian Kendall Morrison.

- 3 -

On May 28, 2008, Vaughn testified before the Grand Jury. He acknowledged that he was "currently charged in [the] case and [was] subject to being indicted . . . [.]" (Hr'g Gov't Ex. 1 at 3, June 18, 2009.) He knew that he could be charged with perjury if he told "a willful falsehood to the Grand Jury." (*Id.* at 4.)

Vaughn told the Grand Jury that Derrick Evans, Oedipus Mumphrey, Kerry Lee, Charles King, Tyree Slade, Marcus Watkins, Andre Watkins, Reginald Morton, Emanuel Morton, and Brian Morrison traveled from Burlington, North Carolina, to Bristol, Virginia, and Bristol, Tennessee, to sell crack cocaine. He explained that Evans had provided Watkins and Mumphrey locations from which to distribute crack cocaine. Mumphrey sold crack at a Bristol motel. Vaughn acted as a lookout. Reginald Morton and his girlfriend Jessica Rodriguez, an individual named Drake, and Candace Maynard helped deliver the crack for Mumphrey.

On his first trip to the Bristol region, Vaughn and others encountered law enforcement. Vaughn, Mumphrey, Reginald Morton, Emmanuel Morton, Drake, and Rodriguez traveled to Bristol from Burlington in three separate cars. While at a motel, law enforcement officers searched one of the cars. In it they found materials used to transform powder cocaine into crack cocaine, including a hot plate and a scale. Officers did not search the car driven by Rodriguez, a gold Buick, which

- 4 -

contained two kilograms of cocaine.  After this incident, Vaughn and the others returned to Burlington.

On a different occasion, Mumphrey paid Vaughn $1,000 to drive him to Bristol.  They went to a mobile home on Anderson Street in Bristol, Tennessee, to sell crack.  There, Vaughn again served as a lookout.  In November, 2007, a mobile home in the neighborhood caught on fire and several law enforcement and emergency personnel arrived at the scene.  Mumphrey and Vaughn went outside.  While outside, they were approached by two officers.  They gave the officers false names, leading to their arrest.  The officers found the keys to Mumphrey's grandmother's car, which Mumphrey was driving, and searched it.  In it, they discovered crack cocaine.

Vaughn described a dispute he had with Mumphrey after their arrest. Mumphrey bailed Vaughn out of jail.  He then asked Vaughn to take his gun back to North Carolina in a separate car.  Vaughn refused.  In retaliation, Mumphrey assaulted Vaughn and kicked him out of his mobile home.  Vaughn returned to North Carolina alone.   Later, in Burlington, Mumphrey insisted that Vaughn take responsibility for the drug charge that had resulted from the arrest in November, 2007.  Vaughn again refused.  Again in retaliation, Mumphrey struck Vaughn in the ribs with a wrench and knocked him unconscious.

- 5 -

During his Grand Jury testimony, Vaughn provided information about specific individuals. Lee traveled to Bristol from Burlington to supply cocaine to various distributors. At first, he operated from Mumphrey's mobile home, but then moved to Frederick Cato's house, where he was eventually arrested. Vaughn described one occasion when Lee gave him $18,000 to give to Mumphrey for a half-kilogram and a "big eight[,]" which he defined as four and a half ounces. (*Id.* at 18.)

Vaughn identified various associates and customers of Mumphrey. Bruce Baumgardner bought a quarter-ounce of crack from Mumphrey at least four or five times a day. Shantha Calhoun visited Mumphrey to buy half-ounces of crack, and then resold it. Douglas Stallworth bought small quantities of crack from Mumphrey at his mobile home on Anderson Street. Vaughn stated that Stallworth "was a good customer." (*Id.* at 21.) Marcus Watkins regularly bought two ounces of crack from Mumphrey. Marcus Watkins' girlfriend, Le Ann Berry, was "real, real tall" and acted as Watkins' runner. (*Id.* at 22.) Vaughn observed Mumphrey sell a half-ounce to King and give a half-ounce to Andre Watkins. Mumphrey also supplied Brian Morrison. Tyson Anderson and Tamaray Lea worked as lookouts for Mumphrey and Marcus Watkins. Additionally, Vaughn testified that Lee and Mumphrey ran Evans' drug business while Evans was in jail. Vaughn knew that some of the individuals

- 6 -

who traveled from Burlington to Bristol had worked for Evans' recording label called "Kant Stop Records," and had had a reputation for dealing drugs.

On May 28, 2008, the Grand Jury returned the Indictment in the case. Over the following four months, Vaughn, Evans, and Marcus Watkins signed plea agreements with the government. Under the terms of each Plea Agreement, Vaughn, Evans, and Watkins agreed to plead guilty to the conspiracy charge and to cooperate with the government and disclose their knowledge of any criminal activity. In return for Evans' cooperation, the government agreed to dismiss two of his three prior North Carolina felony drug convictions from a Sentencing Enhancement Information, a benefit that reduced the applicable statutory mandatory minimum sentence from life imprisonment to twenty years. *See* 21 U.S.C.A. § 841(b)(1)(A) (providing for mandatory minimum sentence of twenty years if there is a prior felony drug conviction and for a mandatory minimum sentence of life imprisonment without release if there are two or more prior felony drug convictions) and 21 U.S.C.A. § 851(a)(1) (West 1999) (providing that a person cannot be sentenced to increased punishment by reason of one or more prior convictions unless government files information stating the previous convictions to be relied upon). In Vaughn's Plea Agreement, the government agreed to do the same with respect to one of Vaughn's two prior North Carolina felony drug convictions. In Watkins' Plea Agreement, the

- 7 -

government stipulated that Watkins was previously convicted for only one felony drug offense.

I accepted the pleas of Vaughn, Evans, and Watkins at their guilty plea hearings. They confirmed that they had had an adequate opportunity to discuss their case with their attorneys, and to read and discuss the Plea Agreements with their lawyers. They stated that they were fully satisfied with their lawyer's representation. The terms of each Plea Agreement were summarized by the prosecutor and Vaughn, Evans, and Watkins each agreed that those terms were included as they understood their agreements. They agreed that no promises had been made to them other than those contained in their Plea Agreements, and that no one had attempted in any way to force them to plead guilty.

After I accepted their plea of guilty, Vaughn, Evans, and Watkins appeared for the government during the first three trials and gave consistent testimony. They demonstrated a detailed understanding of their Plea Agreements, explained their background in drug distribution and their involvement in the charged conspiracy, and testified about their relationship with other defendants and the extent of their criminal activity.

First, Vaughn, Evans, and Watkins each acknowledged the terms of their Plea Agreements. They understood that they faced a mandatory minimum sentence of

twenty years in prison and that they could potentially receive a life sentence. They affirmed that the government had not promised them anything for their cooperation. They hoped for leniency, but understood that their sentence would be set by the court, and not the government.

Next, Vaughn, Evans, and Watkins each described how they became involved with the distribution of crack cocaine in Burlington. Vaughn testified that Mumphrey had introduced him to crack distribution and that through Mumphrey he had met Evans, Lee, and Marcus Watkins. The lucrative drug trade enticed Vaughn. Mumphrey gave him his "first pair of Jordans." (Duty Trial Tr. 65, vol. I, Oct. 7, 2008.)[2] Vaughn stated that in Burlington, Evans "would basically man handle somebody, or take their drugs, or sell at their spot . . . ." (*Id.* at 66-67.) Lee "fronted" drugs to distributors, which meant that distributors would obtain drugs from Lee in advance of payment. (*Id.* at 67.) Mumphrey supplied crack to Marcus Watkins, who then sold it.

Evans testified that in Burlington, he was a "go getter," which meant that he robbed drug dealers of their supply and sold it to other drug dealers for a less expensive price. (Duty Trial Tr. 181, vol. II, Oct. 8, 2008.) Watkins testified that he

_____

[2] The "Duty Trial" refers to the trial of Duty, Davis, and Christine Evans. The "Stallworth Trial" refers to the trial of Stallworth and Baumgardner.

- 9 -

knew Evans and Bryant Kelly Pride from Burlington and traveled with them to Bristol, where they originally intended to expand Kant Stop Records, but turned to crack distribution instead.

Finally, Vaughn, Evans, and Watkins each testified about their drug dealings in Bristol and about their relationships with other drug dealers. Vaughn explained that he had made several trips to Bristol with Mumphrey. As to the Grand Jury, Vaughn related the story about his encounter with law enforcement at the motel, except he added that once they had returned to Burlington, Mumphrey had given Reginald Morton thirteen-and-a-half ounces of cocaine out of the supply. Mumphrey returned to Bristol without Vaughn and sold the remainder.

Vaughn testified that he and Mumphrey initially sold crack from various motels in the Bristol area. Vaughn acted as a lookout while Mumphrey distributed the crack. Mumphrey regularly met with Stallworth and Stallworth bought quarter-ounces of crack on a regular basis. Then, Mumphrey established a distribution point at a mobile home on Anderson Street in Bristol, Tennessee. Again, Vaughn testified that he had been a lookout. Both Baumgardner and Stallworth bought crack from Mumphrey at the mobile home. Stallworth bought "fifties" and eight-balls (3.5 grams). (Stallworth Trial Tr. 108, vol. I, Oct. 28, 2008.) Vaughn explained that a "fifty" was "a fifty of a quarter ounce, like half a gram" and that a "hundred rock" was a gram, "$100 worth

of cocaine." (*Id.* at 108-09.)  Baumgardner bought quarter-ounces three or four times a day and was Mumphrey's "VIP." (*Id.* at 107.)

Vaughn accounted for the circumstances of his arrest in November, 2007, just as he did in front of the Grand Jury.  He added that the police had found $3,000 on him, which he stole from Mumphrey.  He testified that Berry, who was known as "Seven [F]ooter," purchased crack from Mumphrey and delivered it to her boyfriend Marcus Watkins. (Duty Trial Tr. 77, vol. I, Oct. 7, 2008.)  As he did to the Grand Jury, Vaughn explained that on one occasion, Lee had given Vaughn $18,000 to give to Mumphrey for a half-kilogram and a "big eight." (*Id.* at 78.)

Evans testified that one of his drug robbery victims had eventually retaliated, causing him and his family to move to Johnson City, Tennessee, near Bristol.  Once there, Evans' cousin, Alexander Poole, introduced him to Stallworth.  Stallworth convinced Evans to move to Bristol, because  it was "wide open" for crack distribution. (Stallworth Trial Tr. 13, vol. I, Oct. 28, 2008.)  Evans established his first distribution point in Bristol, Virginia.   Thereafter, Stallworth acted as a middleman between Evans and other users.

Evans explained that he had had two main sources of supply, Pride and Lee. Evans brought Pride to Bristol, after Pride was released from prison in North Carolina.  They sold crack out of a house on Texas Avenue.  No dealer trusted Evans,

- 11 -

given his history of drug robberies, so Pride traveled alone to purchase their product. Evans purchased kilograms of cocaine from Pride, which Evans then distributed to the customer base that he had established in the area.

Evans stated that at some point, Evans and Pride had traveled to Atlanta. Lee, a cousin to Evans, traveled from Burlington to Bristol to take Evans' "spot," meaning that while Evans was in Atlanta, Lee sold drugs from the same house that Evans used as a distribution point. (Duty Trial Tr. 189, vol. II, Oct. 8, 2008.) Evans and Lee subsequently became partners. They bought crack in Burlington and distributed it in the Bristol area. They imported as much as five kilograms of cocaine on each trip. For approximately two or three years, Evans regularly dealt in kilograms.

Evans testified that when Lee moved to the Bristol area, Mumphrey came with him. Mumphrey originally worked for Lee, but then established his own distribution ring with the help of Vaughn and Reginald Morton. Evans knew that Mumphrey had sold crack from a mobile home on Anderson Street in Bristol, Tennessee. He added that across that street was Morton, selling from a different mobile home. Mumphrey eventually supplied Evans; first with small quantities but then with kilograms.

Additionally, Evans testified that he had used the profits from his drug trade to establish a music recording label called Kant Stop Records. It involved several of his codefendants, including Marcus Watkins, Slade, Andre Watkins, and King. After

- 12 -

the company failed financially, some of its members joined Evans in his drug pursuits.

Evans explained that his cohorts helped him maintain his drug business while he was jailed on state charges for possession of marijuana. During trial, the government introduced telephone calls that Evans had made from a local jail. During one conversation, Evans directed Anderson "to cut [his] phones off." (Stallworth Trial Tr. 32, vol. I, Oct. 28, 2008.) Evans, Lee, Mumphrey, and Vaughn used cell phones to communicate with their customers. The phones were vital: Evans testified that approximately 70 to 100 addicts in the area knew his number and that approximately 500 addicts knew the number of either Evans, Lee, Mumphrey, or Vaughn. While Evans was in jail, Mumphrey obtained Evans' phones and gave them to Lee so that Lee could make money. Lee had again left Burlington for Bristol. He distributed crack from Cato's house with help from Mumphrey and Vaughn. That attracted attention, and law enforcement executed a search warrant there. Because of that, Evans ordered Anderson to cut the phones off.

The recorded jail conversations also demonstrated Evans' relationship with his family. Evans testified that he had attempted to isolate his wife and children from his drug business.

- 13 -

Evans testified against specific defendants. He stated that he had sold crack from Duty's car shop on Sixth Street in Bristol, Tennessee, that he had paid Duty crack for rent, and that Duty often served as a middleman between him and other users who frequented Duty's shop. Stallworth and Baumgardner bought crack from Evans at Evans' garage on Mary Street in Bristol, Virginia. Occasionally, Baumgardner and Stallworth did errands for Evans in return for crack.

Marcus Watkins testified about his experience as a distributor in Bristol. Until 2006, Pride and Evans supplied him. Thereafter, he bought from Mumphrey at his mobile home on Anderson Street. For a time he distributed from Travis Steele's apartment on Lowry Street in Abingdon, Virginia, and during that time, an individual named Amigo provided his product. While at that apartment, the defendant Robin Davis, whom he saw drive a Lincoln Town Car, and her son Herschel Davis, helped him sell crack. His girlfriend, Berry, regularly assisted him in his trade as well.

2

After the first three trials, Vaughn, Evans, and Watkins sent a series of letters to the court in which they recanted their prior testimony. At the evidentiary hearing, Vaughn, Evans, and Watkins testified under oath and insisted that the statements in their letters were true.

- 14 -

In his recanting letters to the court and at the evidentiary hearing, Vaughn contended that he had been coerced into his Plea Agreement and that he had fabricated his testimony at the Grand Jury proceeding and at trial.

Vaughn sent his first letter to Baumgardner's lawyer. He claimed that the "District Attorney" had stated that if he refused to testify against Baumgardner, he would receive a life sentence, but that if he testified he would not do any prison time. (Baumgardner Mot. for Acquittal or a New Trial, Ex. 1, Dec. 17, 2008.) Vaughn also stated that "they" had promised to find him a job if he cooperated, and mentioned that he had a tape recording of Mumphrey stating that the "dope" was not Vaughn's. (*Id.*)

In a letter dated May 6, 2009, Vaughn asked to withdraw his guilty plea. He maintained that his statements to the Grand Jury were false, that he was coerced by his lawyer, the prosecutor, and law enforcement personnel, and that he had a tape recording of Burlington Police Detective Dalton Majors threatening him with a life sentence.[3] Vaughn stated that he signed the Plea Agreement because his lawyer and the prosecutor told him that he would get a life sentence without it. Vaughn insisted that his family would testify to demonstrate that he had been threatened.

---

[3] In his letters, Vaughn referenced a "Detective Myers." At the evidentiary hearing, it was explained that "Detective Dalton Majors" is the correct name, and I will refer to him in that manner.

In a letter dated May 13, 2009, Vaughn repeated these same statements but added detail. He stated that while in court, he was unable to speak because the United States Marshals Service had intimated him and that the presiding judge and the prosecutor had manipulated his lawyer. He also added that Detective Majors, the prosecutor, and Drug Enforcement Aadministration Special Agent Todd Brewer used subornation of perjury against him and that while speaking to Agent Brewer he had been denied an attorney. Vaughn asserted that Detective Majors had threatened him with a life sentence if he did not travel to Bristol, Tennessee, to speak with Agent Brewer. Vaughn stated that during his interview with Agent Brewer, he was shown pictures of defendants in this case and made false statements about each of them. Finally, Vaughn alleged that the prosecutor and his attorney lied to his mother and that the court had abused its power.

During the evidentiary hearing, several undated letters to the court from Vaughn were admitted as exhibits. In his first letter, he alleged that Agent Brewer had told him that if he cooperated, he would not be charged with conspiracy. He claimed to have lied about Mumphrey and Morton because Mumphrey had severely beaten him. He claimed that the threats made by Agent Brewer, the prosecutor, and Detective Majors were recorded on a tape. He alleged that Detective Majors had attempted to force him to buy drugs off of people he did not know and had refused

him an attorney. He averred that the prosecutor had tried to intimidate other defendants with letters which stated that he was going to get a life sentence because of his recantations. Vaughn claimed that he had lied for the benefit of his mother.

In another letter admitted during the hearing, Vaughn claimed that every statement made in this case had been based on hearsay. He again claimed that the prosecutor and law enforcement officers had coerced and threatened him. He mentioned two tapes: one with an exculpatory statement by Mumphrey and another with the DEA stating that he did not need a lawyer. He then listed twenty defendants he had lied about.

In a different letter, Vaughn specifically mentioned Reginald Morton, and claimed that the statements he made about him were false. He stated that "the people that are testifying against Morton I got them indicted, now there lieing on him to get a lesser sentence and nobody period would be testifying against Morton if I wouldn't have lied about the hole case." [sic] (Hr'g Def.'s Ex. 3, June 18, 2009.) He also stated that his lawyer and the prosecutor had told him that if he did not cooperate, Robert Meade would testify against him at trial.

At the evidentiary hearing, Vaughn's counsel advised him to assert the Fifth Amendment privilege to avoid self-incrimination. Nonetheless, Vaughn testified that he had lied during the first trial. He stated that he had made a mistake when he

- 17 -

pleaded guilty. He alleged that Detective Majors and Agent Brewer had promised that he would not go to jail if he cooperated, and that he had lied at trial when he testified that the government had not promised him anything for his cooperation. He admitted that he had committed perjury and cited a statute that pertained to subornation of perjury.

Vaughn testified that he had lied during the second trial and that his statements in his letter to Baumgardner's attorney were true and that he had written them without help. He stated that he had never seen Baumgardner "with crack cocaine a day in [his] life . . . ." (Hr'g Tr. 25, June 18, 2009.) He insisted that he did not know Baumgardner, and that he didn't know anything about him being a valuable customer of Mumphrey's. He claimed to be unable to remember that at trial he had described different drug amounts and how much they cost. He testified that he had lied when he said Baumgardner went to Mumphrey's mobile home to buy crack and that he had lied when he testified in front of the Grand Jury.

Additionally, Vaughn recanted every incriminating statement he had made about Stallworth. He testified that he did not know Stallworth and that he had never seen him outside of court. He also believed that Detective Majors tricked him into talking with Agent Brewer.

- 18 -

When questioned by the prosecutor, Vaughn claimed that he had been a drug dealer in the past, but since then he had had a religious experience, and therefore did not remember anything about his former drug trade. He acknowledged that a snitch was someone who cooperated with the government, and that people in jail often assaulted snitches. He testified that in jail he had been housed with Baumgardner, Marcus Watkins, Reginald Morton, King, Duty, and Mumphrey. After he had been housed with Baumgardner, he began to write letters to the court recanting his testimony.

Vaughn testified that when he met with Agent Brewer, other law enforcement officers from Virginia and Tennessee were present. He affirmed that he had provided information about drug activity in the area, and that he had identified different locations in Bristol that were associated with drug activity. He agreed that his testimony at the Grand Jury proceeding was similar to the information he provided to law enforcement.

When asked about his trial testimony against Baumgardner and Stallworth, Vaughn stated that "Satan had me so much in bondage I don't remember what day it was and what I said." (*Id.* at 62.) When asked which agent from the Federal Bureau of Investigation had coerced him, he provided Agent Brewer's name, who works for the DEA. Vaughn testified that he had given Agent Brewer false statements, and that

- 19 -

Agent Brewer had included those false statements in Vaughn's affidavit. Vaughn claimed to have reviewed that affidavit before he testified at the Grand Jury proceeding. Vaughn gave varying explanations for why the handwriting in each of his letters were different.

In response to my questions during the hearing, Vaughn believed that he was not at risk for recanting his testimony under oath, based on his understanding of subornation of perjury.

After the evidentiary hearing, Vaughn filed a pro se Motion to Withdraw Guilty Plea. He claimed that his previous lawyer had threatened him with an inadmissible statement and withdrew as counsel, which violated his Sixth Amendment right to counsel. He repeated the same statements about Agent Brewer and Detective Majors, but added that Detective Majors had brought him to Tennessee without a warrant, which was "abduction." Finally, he averred that he had not had access to discovery materials before he signed his Plea Agreement.

Evans' also provided recanting letters and statements to the court. On March 17, 2009, in a sworn affidavit, Evans stated that if he was called as a witness against Morton, he would testify that Morton was not involved in the conspiracy, and that this case was "based solely on lies [and] threats." (Hr'g Gov't Ex. 13, June 18, 2009.)

In his letter to the court dated April 12, 2009, Evans maintained that he had sold only user quantities, and knew only twenty-six of the fifty-one defendants indicted in the case. Notably, Evans stated that he would "continue to willingly [and] truthfully testify[,]" and only asked that "this so-called conspiracy . . . be looked into." (Hr'g Gov't Ex. 12, June 18, 2009.) Finally, in a letter dated May 18, 2009, Evans claimed that while housed in the same jail cell, he and Lee had fabricated stories to make their proffer statements to the government appear more attractive.

At the evidentiary hearing, Evans claimed that he had falsified part of his trial testimony. He indicated that he and Lee had exaggerated the extent of the collaboration between them. He denied that he and Lee had worked together to transport drugs from Burlington to Bristol, that he had robbed dealers of their drug supply, that he had given Lee and Mumphrey a location and phones to make money, or that he had established a mobile home for Mumphrey's use in selling drugs.

On the other hand, Evans confirmed other aspects of his testimony. He related that he had truthfully testified about Duty, Davis, Baumgardner, and Stallworth. He confirmed that the government had not made any promises to him, except for those contained in his Plea Agreement. He admitted that he was a drug dealer. Yet he stated that based on his "legal studies" in jail, he believed that he could get out of his Plea Agreement because of duress. (Hr'g Tr. 94, June 18, 2009.)

Watkins wrote two letters to the court and filed a pro se Motion to Withdraw Plea Agreement.  In his first letter, dated February 6, 2009, Watkins stated that Vaughn did not know him, and that Vaughn was coerced to identify him from a photograph.  He averred that he had made up stories to reduce his sentence.  He alleged that there was insufficient evidence of drug weight and that the evidence consisted of "hearsay drugs."  He questioned the credibility of the government's witnesses, including Robert Meade, and argued that they had lied from the beginning of the case.  He could not trust his lawyer, and argued that the prosecutor was pursuing a personal vendetta.  He also stated that Agent Brewer's affidavit was untrue.

In his second letter, dated February 23, 2009, Watkins alleged that all of his statements in this case were false.  He stated that he had lied in his proffer with the government and in his statements that incriminated Davis.  He wanted to withdraw his guilty plea because he believed that he was innocent.  He had signed his Plea Agreement because his lawyer advised him that it was unlikely he would be acquitted, and because he feared a twenty-year prison sentence.

In his pro se Motion to Withdraw Plea Agreement, dated May 18, 2009, Watkins made four contentions that justified his motion: that Vaughn had recanted his Grand Jury testimony, that Robert Meade was not credible, that he was "under

- 22 -

major duress of potential life sentence" when he had entered into his plea, and that he had been denied an opportunity to review discovery material before he pleaded guilty.

At the evidentiary hearing, Watkins maintained that he had lied when he stated that Davis bought drugs from him and that she helped him sell drugs. He agreed that he had seen Davis in a Lincoln Town Car, and that the information he proffered to the government and his testimony at trial were similar. He acknowledged that snitches were disliked in prison, and that he started to write letters after he and Reginald Morton had been housed together in jail.

## B

A motion for a new trial based upon a witness's recantation should be granted only when:

> (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion (emphasis in original). (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*United States v. Wallace*, 528 F.2d 863, 866 (4th Cir. 1976) (adopting the test of *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928), *overruled by United States v. Mitrione*, 357 F.3d 712 (7th Cir. 2004) (asking instead whether there was a

- 23 -

reasonable probability that without the recanted testimony the jury would have reached a different conclusion)).

Because I find that the recantations of Vaughn, Evans, and Watkins are not credible, I do not believe that their trial testimony was false. In comparison to their trial testimony, the recantations are overwhelmingly inconsistent and unreliable. I also find that the recantations were partly motivated by the pressure or intimidation likely exerted on them by their codefendants in prison, and partly motivated by the misguided and self-created illusion that by recanting their trial testimony, they would somehow avoid punishment for their crimes.

I do not believe that either Vaughn, Evans, or Watkins fabricated their prior trial testimony. Vaughn's testimony before the Grand Jury and at two trials was consistent. At each proceeding, he identified defendants who had traveled from Burlington to Bristol to sell crack cocaine, discussed his encounter with law enforcement at the motel, and described his arrest at Mumphrey's mobile home, where he had worked as a lookout. He also related a transaction between him, Lee, and Mumphrey that involved $18,000, a kilogram and a "big eight." (Hr'g Gov't Ex. 1 at 18, June 18, 2009.) He identified Mumphrey's customers, including Baumgardner, Stallworth, and Marcus Watkins. At the Grand Jury proceeding, Vaughn described Berry, who had helped Watkins sell crack, as "real, real tall" (*id.*

- 24 -

at 22), and at trial, testified that her street name was "Seven [F]ooter." (Duty Trial Tr. 77, vol. I, Oct. 7, 2008.)

Likewise, Evans described similar events at each of the first three trials. For example, he testified that in Burlington, he had robbed other drug dealers of their supply; that with the help of Pride and Lee he had bought crack in Burlington and distributed it in Bristol; that Lee had taken his "spot" when he traveled to Atlanta, (Duty Trial Tr. 189, vol. II, Oct. 8, 2008); that Mumphrey had distributed crack from a mobile home on Anderson Street in Bristol and that Vaughn had helped him; and that he had attempted to start a recording label, Kant Stop Records.

Watkins' trial testimony is consistent with that of Vaughn and Evans. Watkins testified that he had bought crack from Mumphrey at a mobile home on Anderson Street, which is consistent with Vaughn and Evans' statements that Mumphrey had sold crack from that same location. Like Vaughn, Watkins testified that Berry had assisted him in selling crack.

Vaughn, Evans, and Watkins testified that they became involved with drugs in Burlington. Evans' testified that he robbed drug dealers, and Vaughn stated that Evans "would basically man handle somebody, or take their drugs . . . ." (Duty Trial Tr. 66, vol. I, Oct. 7, 2008.) Vaughn stated that the members of Kant Stop Records had been known to sell drugs, and Evans testified that members assisted him in his

- 25 -

drug dealings when the company failed. Vaughn testified that Mumphrey and Lee ran Evans' drug business while he was in jail, and Evans testified that Mumphrey had taken his phones, which contained valuable customer lists, and had given them to Lee to continue dealing drugs.

Statements made by other witnesses at trial who have not recanted corroborate the prior testimony of Vaughn, Evans, and Watkins. For instance, Gregory Meade testified that he had delivered crack to Davis, that he had seen Davis at an apartment where crack was sold, and that she had driven a Lincoln Town Car. Berry testified that Davis had purchased crack from her and Marcus Watkins, that Davis brought other customers to her and Watkins, and that "she had her own customers she supplied . . . ." (Duty Trial Tr. 79, vol. II, Oct. 8, 2008.) This testimony is consistent with Watkins' statement at trial that Davis had helped him sell crack. Additionally, both Timothy Norton and Gregory Meade testified that they had bought small amounts of drugs from Stallworth, consistent with Vaughn's testimony that Stallworth regularly bought quarter-ounces of crack from Mumphrey, and with Evans' testimony that he had sold Stallworth crack and that Stallworth acted as a middleman between him and users.

Compared to their trial testimony, I find that the recanting statements by Vaughn, Evans, and Watkins are not credible.

Vaughn's contention that he was coerced into signing his Plea Agreement is unpersuasive. At both his guilty plea hearing and at trial, he stated under oath that he understood the terms of his Plea Agreement and affirmed that no promises had been made to him. Moreover, in his letters and at the evidentiary hearing, Vaughn gave varying explanations as to why he believed that he had been coerced. For instance, in his first letter, Vaughn explained that the prosecutor had threatened him with a life sentence if he did not testify against Baumgardner and that he would be given a job in return for his cooperation. But on January 16, 2009, at a meeting with the prosecutor, Agent Brewer, DEA Agent Mike Baker, and Vaughn's attorney, Vaughn told Agent Brewer that he wrote his first letter because "he felt very guilty seeing Mr. Baumgardner and knowing that [he] was possibly looking at a sentence of life . . . ." (Hr'g Tr. 120, June 18, 2009.) In later letters, Vaughn did not mention Baumgardner, but alleged that he had been threatened not only by the prosecutor, but also by his own lawyer and law enforcement personnel. Yet at the January 16, 2009 meeting, Vaughn told Agent Brewer that "he was not threatened or coerced to cooperate." (*Id.*)

Similarly, the more general allegations made by Vaughn, Evans, and Watkins fluctuate from letter to letter. For example, Vaughn mentions that he has tape recordings of various threats and promises. In his first letter, he mentions a tape

recording of Mumphrey stating that the dope discovered at his arrest in November, 2007 did not belong to Vaughn. In his letter dated May 6, 2009, Vaughn claimed to have a tape recording of Detective Majors threatening him with a life sentence. Vaughn made the same statement in a subsequent letter, but implicated Agent Brewer and the prosecutor. A different letter stated that Vaughn had a tape of a DEA agent telling him that he did not need a lawyer. In the end, the only tape presented to the court evidenced a phone call between Vaughn and Detective Majors, and it revealed no threats or promises.

Vaughn made allegations against the Marshals Service, the court, and the prosecutor. He believed that the court and prosecutor had manipulated his attorney, that the prosecutor had threatened and lied to his mother, that the prosecutor had tried to intimidate other defendants, and that the Marshals Service prevented him from speaking in court. There is simply no evidence to validate these claims.

In one instance, Vaughn claimed that he lied about Mumphrey because Mumphrey had beaten him and that he lied for the benefit of his mother. In another instance, he claimed that each of his statements in this case were based on hearsay. In one letter, Vaughn mentioned only Reginald Morton, but in another, he listed the names of twenty defendants whom he had lied about.

- 28 -

At the evidentiary hearing, Vaughn claimed that he had made a mistake when he pleaded guilty. In his testimony, he displayed a religious influence. He claimed that he could not remember his prior testimony about different drug terms because he had been "resurrected" and that he could not remember his prior testimony about Stallworth and Baumgardner because at their trial "Satan had [him] so much in bondage . . . ." (Hr'g Tr. 62, June 18, 2009.)

After the evidentiary hearing, Vaughn filed a pro se Motion to Withdraw Guilty Plea that conflicts with the statements he made in his letters and with his testimony at the evidentiary hearing. He claimed that his attorney had threatened him with an inadmissible statement, that he had been abducted by Detective Majors, and that he had not reviewed his discovery materials before he signed his Plea Agreement.

That Vaughn was abducted by Detective Majors was directly contradicted by Agent Brewer's testimony at the evidentiary hearing. Agent Brewer testified that Vaughn had volunteered to travel to Bristol, and that Detective Majors and another officer had driven him there.

In their present motions, both Duty and Davis argue that Agent Brewer's testimony during the evidentiary hearing verify that Vaughn was told that he would not be charged in this case. I disagree. Vaughn testified in front of the Grand Jury after he met with Agent Brewer, and he acknowledged that he was "currently charged

- 29 -

in [the] case and [was] subject to being indicted . . . [.]" (Hr'g Gov't Ex. 1 at 3, June 18, 2009.) In any event, Agent Brewer testified that he had stated that he would "try to speak with the district attorney" in Sullivan County, Tennessee, not the prosecutor here. (Hr'g Tr. 137-38, June 18, 2009.)

The recanting statements of Evans and Watkins contain inconsistencies as well. In his first recanting statement, Evans stated that he would refuse to testify against Reginald Morton, and that this case was "based on lies [and] threats." (Hr'g Gov't Ex. 13, June 18, 2009.) Yet in a later letter, Evans expressed a willingness to continue to cooperate. Not until his final letter did Evans state that he and Lee had fabricated their stories. At the evidentiary hearing, Evans claimed to have lied about his cooperation with Lee, but confirmed other aspects of his trial testimony. In Watkins' first letter, Watkins stated that all of his statements were false, but later confirmed that Davis had driven a Lincoln Town Car. In short, the nature of the allegations changed over time.

Furthermore, the timing of the letters suggest that other defendants in this case pressured or manipulated Vaughn, Evans, and Watkins. Vaughn was jailed with Baumgardner, and then specifically mentions Baumgardner in his first letter. Similarly, after Watkins had learned that he would testify at the fourth trial and after he had been jailed with Reginald Morton, Watkins wrote his first letter. Lee also

- 30 -

wrote a recanting letter to the court, in which he claimed to have exaggerated the extent of his cooperation with Evans, but at the fourth trial he testified that King had forced him to write it while they were jailed together. Evans did not recant until he learned that he would testify at the fourth trial.

Relatedly, the letters sent by Vaughn and Evans display inconsistent handwriting styles, which suggests that someone other than Vaughn or Evans wrote them, and I find the attempts by Vaughn and Evans to explain that fact unpersuasive.

At the evidentiary hearing, Vaughn, Evans, and Watkins acknowledged that they had breached their Plea Agreements and committed perjury. But they acknowledged as much not to enhance the credibility of their recantations, as Duty and Davis argue here. They did so based on their mistaken and uninformed view that the concepts of duress, subornation of perjury, and coercion would ultimately set them free, irrespective of whether they adhered to the terms in their Plea Agreements, and regardless of whether they committed perjury. This does not demonstrate a sincere concern for the truth. Vaughn, Evans, and Watkins are simply trying to game the system.[4]

---

[4] Because I do not believe that the trial testimony of Vaughn, Evans, and Watkins was false, I need not consider the remaining two factors under *Wallace*. *See United States v. Carmichael*, 726 F.2d 158, 159 (4th Cir. 1984) ("The failure to meet any of [these] requirements is fatal . . . .").

- 31 -

III

Duty also contends that the government failed to disclose evidence that could have been used to impeach Vaughn, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Brady*, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The three necessary elements of a *Brady* claim are: "(1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material." *Monroe v. Angelone*, 323 F.3d 286, 299-300 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In this context, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). The disclosure requirement covers both impeachment material and other exculpatory evidence. *Id.*

- 32 -

Duty claims a *Brady* violation in connection with Vaughn. He maintains that the government failed to disclose that Detective Majors had promised Vaughn that he would not be charged with drug offenses in state court.

It is unclear from the record whether Agent Brewer had concrete knowledge of any promise made by Detective Majors to Vaughn. At the evidentiary hearing, Agent Brewer testified that while he spoke to Vaughn at a proffer session, he had been "under the impression" that Vaughn "was not going to be charged with [previous] drug buys in Burlington." (Hr'g Tr. 135, June 18, 2009.) But Agent Brewer was unsure as to whether Detective Majors had told Vaughn that he would not be charged in North Carolina, and he was unsure as to whether Vaughn had expected to avoid any state charges in Virginia or Tennessee through his cooperation. He confirmed that he "wouldn't know what Mr. Majors did or did not say to Mr. Vaughn about those charges[.]" (*Id.* at 129.)

Assuming that Detective Majors promised Vaughn that he would not be charged with a state offense, I find that even if the government had disclosed this information, the result of the proceeding would not have been any different.

The government's evidence against Duty was strong. Evans admitted that he had sold crack from Duty's garage, and that Duty had acted as middleman. This was corroborated by Lee, who testified that Evans sold from Duty's garage; by Tammy

- 33 -

Stallworth, who testified that she had bought drugs from Evans at Duty's garage approximately thirty different times; and by Gregory Meade, who testified that he purchased cocaine from Evans at Duty's garage approximately three or four times a week. Additionally, Howard Mayfield testified that he had bought crack from Duty approximately twenty times and Jason Ward testified that he purchased crack from Duty at least five times.

Although Vaughn testified generally about the conspiracy at Duty's trial, he did not provide specific evidence against Duty. Nonetheless, Duty contends that the presumed failure to disclose was material because if it had been revealed that a promise not included in Vaughn's Plea Agreement was made, the jury could have reasonably inferred that the government made promises to all of their witnesses.

I find that such an inference would have been unlikely, given the testimony of Ron Humble and Lyle Bledsoe, two government witnesses who had not been involved with the conspiracy, but who testified about the suspicious activity they had witnessed at Duty's garage. Moreover, Lee, Tammy Stallworth, Meade, Mayfield, and Ward were thoroughly cross-examined at trial, providing the jury a sufficient opportunity to evaluate their credibility. Under these circumstances, I find that the presumed failure to disclose was not material.

IV

For the foregoing reasons, it is **ORDERED** as follows:

1.  The Second Motion for New Trial (#1458), as amended (#2017)on behalf of Anthony Eugene Duty is DENIED; and

2.  The Motion for New Trial Under Rule 33 (#1393, #2016) on behalf of Robin Marie Davis is DENIED.

ENTER: August 6, 2009

/s/ JAMES P. JONES
Chief United States District Judge

- 35 -